and we have attorney Ronald Bosman for the appellate and good morning again and Thomas Barton for the appellate. So when you're prepared to proceed, you may. Thank you, Your Honor. Counsel, members of the audience, Your Honors, I'm here today with Ronald E. Osmond from the firm of Ronald E. Osmond and Associates representing Randy Hindman in a case that's in the First Judicial Circuit in Williamson County. May it please the Court. Yes. This appeal comes to you today from the Honorable Judge Dauphinette's order of dismissal entered on September 16, 2017 of a complaint filed by Randy Hindman against Maxwell Ahmad M.D. and Marion I. Sinners Limited. The complaint consists of three counts, count one being a count for violation of the Illinois Consumer Fraud Act and counts two and three sounding in medical malpractice. Count one was dismissed with prejudice on November 16, 2011 and counts two and three were dismissed under the doctrine of res judicata on September 6, 2017. Marion I. Sinner was previously dismissed on May 31st, 2016 in agreement of parties. Now, Judge Dauphinette's September 6, 2017 dismissal order turned completely on his analysis of res judicata and the application of two Illinois Supreme Court cases, Hudson v. City of Chicago and Rain v. David A. Noyes and Company. No, N-O-Y-E-S. And if you read Judge Dauphinette's order, you can see that Judge Dauphinette in his last versions of it was troubled that by applying the analysis that is mandated by the holdings of Hudson and Rain, that the rule is unduly harsh and has the effect of denying a plaintiff the ability to voluntarily dismiss a claim. The underlying harsh rule Judge Dauphinette was referencing is the transaction analysis rule as set forth in the Illinois Supreme Court case of River Park v. the City of Highland Park. The transactional rule is a fact-based analysis approach to analyze separate claims to see if the claims arise from a single set of operative facts regardless of whether they assert different theories of relief. This approach is mandated by the Illinois Supreme Court holding in River Park, where in the River Park case, the judge quoted from the restatement second a judgment and said, well, when a valid and final judgment related in action extinguishes the claim pursuant to the rules of merger or bar, the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction or series of connected transactions out of which the action arose. In other words, what factual grouping constitutes a transaction and what groupings constitute a series are to be determined pragmatically, giving way to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. In order for a claim to be prohibited by res judicata, the following three elements must be satisfied. One, there was a final judgment on the merits rendered by a court of competent jurisdiction. Two, there was an identity of cause of action. And three, there was an identity of parties already previous. Judge Golfinet believed that all three of the requirements for res judicata were present in the Hyman case. While I agree that the Honorable Judge utilized the correct pragmatic analysis of the facts as mandated by River Park, Hudson, and Lane, I believe that he misapplied the facts when he determined that the Hyman claims had an identity of cause of action. In accordance with the Supreme Court cases, in analyzing whether the claims have an identity of cause of action, the court is required to look at the facts that give rise to the defendant's right to relief, not simply to the facts which support the judgment in the first action. In accordance with Hudson and Lane, this requires an analysis of the facts to see if they arise out of the same operative facts and if the facts indicate a convenient trial unit. While the Hudson and Lane cases looked at the facts of each of those cases and found that in that situation they arose out of the same operative facts, conversely, elementary courts had not been hesitant to utilize the transactional twist as set forth in River Park, Hudson, and Lane to find that the facts of these cases did not show that the claims arose out of the same operative facts. The primary case of that Supreme Court case of Rogers v. St. Mary Hospital, where they did the same analysis and came to the conclusion that it was a medical malpractice case that was brought, settled, and then they brought another case in regards to lost x-rays that the Supreme Court said did not arise out of the same operative facts and allowed that to go forward. I believe the facts of this case are more closely aligned with the Rogers decision than Hudson and Lane. As pointed out in my papers in the Hyman filings, the time period involved between the two claims is different. There are different causes of action. They have different motivations and they have different origins. In order to prevail on a consumer fraud claim, the plaintiff must prove a deceptive act or practice that the defendant intended that the plaintiff rely upon the deception, that the deception occurred during conduct involving trade or commerce, and that the injury to the plaintiff was proximately caused by the deception. On the other hand, to prove a medical malpractice case, the defendant must prove standard of care by which to measure the defendant's conduct, negligent breach of that standard, and defendant's negligent breach. No intent is required. No requirement of trade or commerce or injury due to the deception. So the two causes of actions are distinct. When you analyze the facts in Hyman, you will not find a single set of operative facts, but instead two distinct sets of operative facts, one for the consumer fraud and one for medical malpractice. The medical malpractice, as alleged in the complaint, occurred from January the 18th of 2008 to June 7th of 2008 and involves procedures, laser procedures on Mr. Hyman's eyes during that specific time period. The consumer fraud ended on December the 27th, 2007, some weeks before the medical malpractice is alleged, and the consumer fraud allegations are that there was a bait-and-switch scheme ongoing for what was called no-shot, no-patch, no-stitch cataract surgery. There is no allegation within the complaint that cataract surgery was in the beginning portion of the medical malpractice. It is specifically for laser surgeries. In accordance with Illinois law, the minute you lose any kind of consumer fraud act, the minute the fraud is over. In other words, he was induced to come into the surgery center for no-shot, no-patch cataract surgery, and he had the cataract surgery on December the 27th, 2007, so the consumer fraud action is done. Now, so in conclusion on the issue of the transactional test, as I stated earlier, I do not disagree that Judge Goffinette used the wrong standard. He used the standard as set forth in River City, Hudson, and Rain. However, when you look at the Rogers case, compare the fact situation in the Rogers case and the fact situation in the Rain and Hudson case, you will see that this case, the Hyman case, is almost all forward with the Rogers case and has very little in common with the Rain's. The fact situation is forward as the continuous requirement. So, if you have any questions in regard to that, I'm going to then start addressing things that are not. Okay, now. I don't think so. Okay, thank you. Well, in Mr. Norton's brief, he raises several other issues and defenses that were not argued. Well, they were argued, but the judge did not, Judge Goffinette did not rule on those. And those issues are one-time filing violation, rule party and interest, and splitting of claims. Now, I have, you know, answered all of those, and in my reply brief and in the supplemental C-4 to C-11, I think that I have addressed all of those issues, and I'm going to use my remaining time to talk about, you know, I may not get to all of them, but I would ask that you review those whenever you're looking at it. The first one, and this one is one of the actions that the defense claims has violated the one-time filing rule and also the real party and interest rule. Now, the real party and interest rule only goes to the issue of were the parties the same for dismissal. The paragraphs, I mean, the third requirement. This was, what the defense is complaining about is that Mr. Hyman, Mr. Hyman was a plaintiff, ex-rail, in a federal and state false claims case that was filed March the 24th of 2014 in the Federal District Court of the Southern District of Illinois. Now, in that complaint, Mr. Hyman, the parties in the complaint were the United States of America and the state of Illinois, ex-rail, Randy Hyman, and then two ladies, a lady by the name of Chick and a lady by the name of Lamine. The complaint was an 18-count, multi-page complaint under the Illinois False Claims Act and the Federal False Claims Act. And in those 18 counts, there was various allegations covering 10 years of billings by certain defendants of which Dr. Ahmad was one of the defendants and Marianne Eisen was one of the defendants. There was no allegation in that complaint in regards to the Illinois Consumer Fraud Act. There was no allegations in that complaint in regard to medical malpractice. It was a generic, good old federal, state false claims act on billing. Now, as a predicate to stating a cause of action for false claims, you have to set down the underlying procedures that have been performed, but it's not medical malpractice. There's a myriad of cases that state that. So, in my analysis of that, when you get to the time for filing, Mr. Borden has taken the time for filing off of the federal case. Now, the federal case was voluntarily dismissed. Some of them was never served. They were voluntarily dismissed on June the 17th of 2015. At the time of that dismissal, Hyman Warren had been filed. So, Hyman Warren, which was the Consumer Fraud Act and the Medical Malpractice Act, was pending when the federal case was dismissed voluntarily. And Mr. Hyman then was no longer involved in the federal case, of course, because it was dismissed. Now, the second thing that I want to discuss is the defendant's position in regards to who is the real party in interest. And Mr. Borden has discussed the real party of interest, and there is an Illinois Supreme Court case that analyzes who is the real party of interest for the purpose of determining the constitutionality of the Illinois False Claims Act. That was what that case stands for. And I don't know that I can pronounce it correctly, but I'm going to try. Give me just a second. The Selecity case is a Supreme Court case that's cited. I'm going to just say Selecity. I'm sure Mr. Borden will correct me. The Selecity case was brought challenging the constitutionality of the Illinois False Claims Act. The claim was that the relators, the people that bring the action on behalf of the government, when the government then does not intervene in the action but allows the relator to continue the action, the claim was is that you have no standing, so therefore you can't proceed with the action, the relator. The Selecity court said no. Look, this has been decided in 2000 by the federal Supreme Court in the Vermont case. And in the Vermont case, it was exactly the same claim except it was a claim that the relators could not maintain the action in the federal statute. The federal statute in Vermont, what you have to do whenever you analyze this is you have to look carefully as to what the Vermont court said. And they said that this is really only the way that the relators can maintain the action in a quid prom case only is on partial assignment theory and that the government has partially assigned to the relator their right to a portion of the recovery. The Vermont court further said that that right does not ripen until such time as there is an award because what the relator gets is a portion of the award plus attorney's fees and costs. And they further went on to say it only applies in quid prom cases. Ratchet back to the Selecity case that cites Vermont, cites that, and in fact says that it only applies to cases of quid prom cases. So that's a very limited, very limited holding and does not in my opinion stand for the proposition that someone that files a false claim case or a P.I. case where false claims are involved is somehow invoking the rule of lawyer's refinance. And the reason I say that is think about this. Under Mr. Morton's analysis and position, if one files a medical malpractice case, if I'm a medical malpractice case of a Medicare patient, let's just assume they treat for three years for a broken arm, medical malpractice is committed during this three-year period, there is multiple findings, multiple procedures, some of which are fraudulent, maybe he did too many tests, maybe he didn't do the tests, but they're fraudulent billings. Under their theory, once the medical malpractice is heard because, quote, the operative facts in these three years are the same as your billing questions, then the federal government and the state government would be, it would be re-judicata against it. And that's certainly not what the Federal False Claims Act nor the Illinois False Claims Act contemplates in any manner because they wouldn't even have been on notice. But under their theory and under their analysis, that would be the result of that. Now, I'm going to go now then to claim splitting. Difficult to split a claim that you don't have any interest in writing. The Federal False Claims Act that was filed, completely different parties, completely different causes of action, is of no moment whenever we're trying to figure out the filing times. Both operative dates on the filing times. I'm going to go now to Mr. Barton. Your Honor, my name is Tom Borton. I represent the defendant, Dr. Makhlul Ahmad, appellee in this appeal. We believe that this case should be dismissed for two cogent reasons. One is the re-judicata as to the medical malpractice claims. Once the Consumer Fraud Act claims were dismissed on their merits and the court made a finding that those Consumer Fraud Act claims specifically arose out of the medical treatment that this patient received. He actually noted in his order that this looks like an informed consent issue. And the basis of that dismissal is you can't sue in Consumer Fraud for medical negligence, dental negligence, or malpractice. Legal services, dental services, medical services are exempted from Consumer Fraud Act. So what we have is we have our trial court both explicitly in its order and implicitly in its ruling finding that the Consumer Fraud Act claims arose out of the medical negligence claims as well. And that's true because the Consumer Fraud Act claims, what we're talking about is he's saying, look, you misrepresented the procedure to me, the cataract procedures to me. And what he's saying is you were going to do it without a shot, without a stitch, and you did it in a different way. Well, that also relates to the physician's ability and requirements to give informed consent, which is a medical negligence claim. Can you then distinguish the Rogers case? Oh, absolutely. The Rogers case deals with a woman who died after childbirth. Two days after childbirth, they sued for medical negligence. Many months down the road, they lose the x-rays. They sued them for a statutory violation of losing the x-rays. That arose from a medical malpractice case. It didn't arise from the medical malpractice case. Losing the x-rays didn't arise from it. Correct. But it's part of the transactions. You wouldn't have had the issue about the x-rays that were, I guess, necessary for the proof of the malpractice case? No. What's going to happen is the medical negligence claim is going to be decided on whether the physicians complied with the standard of care or breached the standard of care. The suit against the hospital for losing the x-rays down the road was a separate transaction, a separate event. So are you saying that the case, the consumer fraud case, is going to be decided on whether there was medical negligence in the operation? I mean, I understood Mr. Osmond to say that the fraud aspect of that cause ends at the time there is a surgical procedure, not the outcome of the surgical procedure. A couple things to point out about that statement. First of all, there were two cataract procedures leading up to the allegations here. And the second procedure actually takes place in January 2008. We cited that to the court and cited the record there. So this is not a defined line of January 2008 is medical negligence and everything before was consumer fraud. When you look at this complaint, we're sued for allegations in 2002 for not doing proper laser treatments or doing improper laser treatments for his diabetic retinopathy. But I think getting to the court's issue, the focus, the central focus under the transactional test is whether or not these causes of action, irrespective of whether they require different proof, arise from the same core facts at issue. Are they the same transaction or series of transactions? And I'll give you an example just to show you what would happen if we accepted Mr. Osmond's theory on what you could do here. I try a lot of medical malpractice cases. With either procedure you're doing, with any procedure, whether it's an orthopedic surgery, general surgery, or an eye procedure, there are different elements to it. The surgeon is required to provide informed consent. He's required to properly perform the procedure. He's required to properly follow up and visit. So if you take a total need procedure, for instance, something unfortunately many of us are going to have to have as we go down this road, there's going to have to be an issue of informed consent. There's going to have to be an issue whether he complied with the standard of care during the procedure. And then you're going to see several months where there's going to be follow-up care. So you can imagine a plaintiff comes in and he sues for all of these. You didn't give me informed consent regarding an infection. You didn't perform the procedure so that I wouldn't get an infection. And then you failed to diagnose my infection, and it all led to this terrible injury of my leg that required an amputation. That is one core set of facts that have to be brought together, and you cannot split those claims under Hudson, Rain, and River Park. But I'm trying to understand how that, you say, is the same as... Consumer fraud. Consumer fraud. Absolutely. In that you don't necessarily have to have a good or bad outcome with consumer fraud. If it was truly a bait-and-switch, the negligence has nothing to do with it. Sure. Consumer fraud has to do with you told me you were going to do it this way, you provided me inadequate informed consent, you did it another way, and the allegation I'm damaged, I have been injured. Well, you have been damaged by the bait-and-switch, though. If they didn't need the surgery at all, that would be the damage, correct? Well, the damage here, the damage in our case that's alleged is this loss of vision. The consumer fraud claim says, look, I've suffered this loss of vision because of the consumer fraud. You said you were going to do it this way, you did it another way, I've had this loss of vision. It's one injury. It's why I usually... Now, which plaintiff is that? I'm sorry. Which plaintiff is that? You're saying the loss of vision. That's Heinman. That's Heinman, okay. Yeah, that's our case. So I'm just trying to sort this out because it seems like you're borrowing some from Rogers and then some from Hudson and Rain. No, we fall... One of the things with Rogers is it's decided before Hudson, Rain, and River Park. It was. And there used to be the same evidence test. We used to look at whether there's the same evidence that determines whether there's an identity of cause of action. River Park, our Supreme Court said, no, that's not right. We're using the transaction test. We're looking at whether or not they arise out of the same core facts. We're not going to look at the same evidence. It's too narrow. They said it's just too narrow. It's much broader, the transactional test. So that's where we get into, look, you can create many theories. As attorneys, we do this and we learn this in law school and torts. There's something that happens. Is it a battery? Is it an assault? Is there negligence involved? We've got all kinds of different theories, but they arise out of the same core facts. And that's what Mr. Heinman has. He has a claim, which the trial court very properly recognized, is they arise out of the same facts. They arise out of the medical care and treatment. You can name it in consumer fraud. You can name it in medical negligence. But it's all relating to this care and treatment. Can you then tell me again about how Rogers is different than what you've just said? Because that arises, the x-rays would not have been taken but for the injury or the negligence that allegedly caused the injury. X-rays happen without negligence. Well, sure they do. But in this case, there was an allegation of negligence, right? Right. They're saying you improperly treated her during her childbirth. Ergo, she's deceased. We have a wrongful death medical malpractice claim. Then, you know, you could say two, three years down the road, somebody loses the x-rays and they say, Look, that's a statutory violation. You had an obligation under a statute, hospital, to secure these. You didn't do it. That's a separate transaction. It's a separate issue. But the x-rays were part of the medical care and treatment that was alleged to be a violation under the negligence theory, just as in his case, the bait and switch allegations are part of what resulted in the unnecessary surgery. The x-rays are part of the medical care and treatment, but there's no wrongdoing with respect to the x-rays until they're lost years down the road. That's a separate transaction. That's a separate event. Your obligation to store the x-rays is separate than anything that has to do with whether someone's complying with the standard of care. Here, in consumer fraud, I'm mixed. I'm mixed because the consumer fraud arises out of what's represented to the patient, what's given to the patient on informed consent, what's actually done during the procedure, and also the injury to the patient when he has a reduction in vision. Or what if he had no injury? What if he had absolutely no injury at all but just had unnecessary surgery? That's still a bait and switch, and the damages are purely economic, correct? Theoretically. Theoretically. Theoretically. So where would that fall? Would that fall under Rogers or would it fall under River Park? It means there's no medical malpractice. It means there's no second claim that arises. So there's nothing to compare it to to see if it arises out of the same transaction or occurrence. There's just a strict consumer fraud claim. There's no dispute we have a final judgment on the merits. Our case comes within Hudson on all fours. The Rogers case is the only case he's citing. It's decided before the transaction case was determined by our Supreme Court to be a B test that applies to this scenario. So they're still looking at same evidence in Rogers. Now, when you look at Hudson, you've got a case where a child, they call EMS because he's having an asthma attack. They sue in negligence. They sue in willful and wanton conduct. Their negligence claim gets dismissed pursuant to the Emergency Medical Services Act. They non-suit their willful and wanton misconduct claim, and then they refile it. The court said, look, you can't do that. You're engaging in claim splitting. These causes of action arise out of the same transaction or occurrence, and you can't split this cause of action. The dismissal of a negligence claim with prejudice was a final judgment, and when you non-suited, that became a final appealable issue. One thing I haven't understood in here is when the voluntary dismissal of Hinman 1 came, why wasn't there an appeal of the court's finding and ruling that the Consumer Fraud Act claim was dismissed and that it actually arose out of the medical care and treatment? They had this ruling when they're sitting there. They know the court has found this. Why aren't they appealing that so that they could come back with their medical negligence claim if they could potentially do so? There was no appeal. That became a final ruling. They're arguing something to this appellate court that they never took up before when Hinman 1 was decided. That's where that should have been raised. That's where that issue should have come up. Raised adjudicata bars not only what was determined in the first suit, but also every other matter that might have been raised in that suit. And I think this goes to your point of Rogers and your questions about Rogers. It could not have raised in the medical malpractice suit events that hadn't taken place yet. The loss of the x-rays, that couldn't be raised until the x-rays got lost. So we're barring what was actually brought and what could have been brought at that time. And that's what we have here. And that's why we're on all fours with Hudson. That's why we're on all fours with River Park. I anticipated what Plaintiff was going to argue in saying look at the time frame. There's time frame involved. There's gap. There's just different cares and treatment that's going on. It's why we went to the River Park case. River Park dealt specifically with negotiations and events that took place over the course of years, 88 to 92. The developers bought a piece of property up in Chicago. They're going to develop to go to the city to get the preliminary plans approved. They won't approve the final plans. And then the city goes and buys it from the bank, the same piece of property. The guy sues them. He sues them in federal court and says, look, I've got a 1983 action. You deprive me of my property. They said, no, you don't. You don't have standing here. They dismiss that claim with prejudice. He goes to state court and he tries to file state court claims against the city for unreasonably denying his request for final approval to develop this property. He said, I'm sorry. The result is you're barred. This is raised judicata. This arises out of the same transaction and occurrence that took place before. The same issue you raised in your 1983 actions is now being raised here. The same facts, just different theories that require different proof. That's why the time frames don't matter so much. And Plaintiff is very drastically trying to cut this off and say it ends on December of 2007. In fact, there's another cataract procedure and the record on appeal will show that there's continued follow-up from those cataract procedures where there's alleged negligence taking place too. These are inextricably intertwined. They arise out of the same core facts. Counsel, are you saying, does it come down to the fact, your argument, that there's a loss of vision, it's an injury, both claims? Does that mean it's the same loss of vision or is it a different procedure? It's the same loss of vision being claimed. I mean, that's one thing the trial court pointed out in its order is, look, your recovery is for the same loss of vision throughout. We don't know how much loss of vision he's claiming as a result of the cataract procedures, how much loss of vision he's claiming as a result of the YAG laser procedure, how much loss of vision he's claiming from the laser procedure, or the alleged delay in diagnosing his retinal detachment. So it is key that there is one injury here, which is this loss of vision throughout. I think that's important to this case. Just like River Park, there was one injury to him. It was, you deprive me of the opportunity to develop this property. It's one injury, and we have one injury in this case as well. I also noted that the court in Hudson lists the policy reasons for why it has this ruling. Because I know a lot of people look at this and say, oh, this is harsh, even the judge at the trial court level. He knows of the case. He knows that Hudson is out there. But when I start looking at the policy reasons behind Hudson, it's not so harsh to me. And the reason is, is because when someone files a suit, they said the policy reason is you nonsuit on some of your counts and then go to final adjudication on your other ones and lose. You should not be able to refile your nonsuited or voluntarily dismissed counts after that. Adjudication can take place in many ways. It can take place on a dispositive motion, summary judgment, involuntary dismissal. So if you file all the claims, like I talked about in the orthopedic surgery example, informed consent, negligence in the surgery, and negligence in the post-operative care, let's say I'm going through the case and I think I really like the negligence in the surgery. I'm going to go ahead right before trial, nonsuit the post-op care, and I'm going to try you on informed consent and performing the procedure improperly. Well, I lost. Well, you know what I'm going to do now? I'm going to refile my allegations in the post-operative care that you failed to do things properly. I'm going to have a second trial on that. You can't split those claims. That's why the result is not harsh. You can't have plaintiffs splitting their claims as they go through this. I want to talk a little bit about the one refiling rule. We cited the case from Winnebago County in our brief. Basically it says, look, you can't file multiple suits against people and then just use your last filed case as the measuring stick as to when you have a year to refile. Okay? So in that case what happened is there's an auto accident, files in Winnebago County in the arbitration division, then files his second suit in Winnebago County Circuit Court. Then after he's got this one on file, he nonsuits the first one, then he nonsuits the second one, and he says, I've got a year from nonsuiting the second one. And the court said, no, you only get one refiling. Once you do use your nonsuit, you've got a year from the date of your first nonsuit to refile your case. I'm sorry that you had another case pending, but that's the rule. You get one refiling. It's pretty clear. Plankton in this case, he filed multiple suits against my clients. He filed Hinman 1. After that he filed Hinman Federal. And the only distinction they try to make on Hinman Federal is they say you can't count Hinman Federal because Hinman Federal was a key TAM case. Well, if you read the complaint in Hinman Federal, it goes through all the allegations of medical negligence in this case. It says, look, I was treated during this period of time. I was negligently treated. I was inappropriately cared for. It all caused a reduction in my vision and a misbilled for this. This plaintiff, as we've cited in the Illinois Supreme Court case, is a real party and interest in that case. So when he nonsuited that case in June of 2015, he had until June of 2016 to refile. And that's a deadline he didn't make. At times I listen to argument from counsel, and I think he's suggesting we ought to just get rid of the raised judicata rule on transactional thefts. It's a harsh rule. He says it's a bad rule. It sounds like he's asking this court to, in essence, overrule Hudson, Rain, River Park, and their progeny that adopt the transactional thefts because under the transactional thefts, this is clearly on all fours raised judicata. Jeopardy attached, once he had that consumer fraud claim dismissed, the court put him on notice. I'm finding this is coming out of the same medical facts that you've got in your medical negligence case. He nonsuits. He doesn't appeal. He refiles, and the court properly recognizes that this result is required by Hudson, Rain, and River Park. We're asking that the court affirm the trial court's proper dismissal for plaintiff's violation of raised judicata, which is the claim-splitting issue. We're also citing to the court the idea that the court can't affirm on any other issue, so we wanted to bring before the court the other issue we raised, which is the one refiling rule. They violated that. They filed multiple suits. You don't get to use your last nonsuit as the date for your one year. You have to use as your measuring stick your first nonsuit. Thank you, Your Honor. Thank you, Mr. Barton, for your argument. Mr. Osmond, do you have a rebuttal? The first issue I'd like to discuss is Judge Belayer's order that counsel said for somehow or another he's controlling in this case. We'll do a close reading of Judge Belayer's order. He says that it's very fact-specific to this case, and he was analyzing the Illinois Consumer Fraud Act and the advertising statutes. He very specifically says, and by the way, we never claimed a violation in the Consumer Fraud Act for an informed consent violation. Us, the judge, says that he thinks it more appropriately belongs in that. Counsel has now told me that when we said that. We didn't say that. It's not in our complaint. This judge's opinion is of no moment to this case. When we nonsuited this case, this disappeared. This is not the law of the case. It doesn't even apply to the facts that we now have before us. This is a circuit judge opinion that has no presidential value in the issues that we're talking about today. It's not the law of the case. It's gone. You've cited to the court that. That's what happens whenever you nonsuit. Everything before is as if, quote, it never happened. So that is a very that's a red herring in my opinion. Now, also, in our claim, count one, we did not pray for, quote, loss of vision. We prayed for damages that's applicable and as allowed in the Illinois Consumer Fraud Act, which is a specific set of things. So there could be a distinct violation of the Illinois Consumer Fraud Act without any violation of negligence or anything else. That is not a negligence statute. It's an intent statute. And counsel is correct. There was another cataract surgery about January 4th, if memory serves me correctly. Well, by that time, the Illinois Fraud Act had already been had been extinguished because there was no more reliance. All the reliance and all the predicate had been done prior to the first cataract surgery. That's whenever the Illinois Fraud Consumer Act ended. Counsel has done a very good job of talking about rains and talking about Hudson. First off, the Rogers case is good law. It's not been overruled by rains. It's not been overruled by Hudson.  If you read the analysis of it, the issues on the transaction is exactly the same as River Park, Hudson, and rains. It's not been overruled. It is good law. So you're saying that they did use the transactional analysis in Rogers? Absolutely. Absolutely, Your Honor. It's exactly the same as Hudson and rains and River Park. What it did, what it did, it went through, it went through both of the actions, but it based its decision on the transaction. I would also invite the court to look at the dates and the times that were involved in all of those cases. None of them are, there's one that's medical malpractice. And, you know, I agree, you know, that all occurred, the x-ray occurred during the time period for the medical malpractice. I agree with counsel that it's sometimes difficult to look at this. But I don't think you should just throw off some kind of white line theory. You have to look at it as the Supreme Court says in a pragmatic way and look. And when you look at our complaint and you look at the facts in this case, you will see that there's a distinct white line between the consumer fraud action, what's grateful for relief, the parties involved, and the medical malpractice. Medical malpractice concerns six months of treating for 13 laser treatments. It has nothing to do with cataract surgery. Cataract surgery, there's no complaint that the cataract surgery, which is the subject of debate and switch, there's no complaint that there was any loss of vision because of the cataract surgery. The loss of vision is the medical malpractice on the laser surgeries. Now, I will concede, counsel, if we had brought a medical malpractice case on the cataract surgery as well as the laser surgery. Thank you. We've heard it. Thank you, Mr. Osmond. Thank you, Mr. Bartley. We will take the briefs under and your argument under advice and then we'll move on. Thank you.